IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PRISCILLA ANDRING HUMPHREY,

    Plaintiff,

v.                                                                 Case No. 13-4025-JTM

STATE OF KANSAS DEPARTMENT OF
WILDLIFE, PARKS AND TOURISM,

    Defendant.

MEMORANDUM AND ORDER

Plaintiff Priscilla Andring Humphrey filed suit against her former employer, the State of Kansas Department of Wildlife, Parks and Tourism, alleging that her termination was discriminatory and retaliatory under federal law. On the defendant's motion to dismiss, the court dismissed Humphrey's FMLA discrimination claim and her Title VII retaliation claim, leaving only her Title VII race/color discrimination claim. The court now has before it the defendant's Motion for Summary Judgment (Dkt. 32). After reviewing the briefs on the motion, the court is prepared to rule.

**I. Uncontroverted Facts**

Humphrey is an African-American female who was formerly employed as an administrative specialist by the State of Kansas Department of Wildlife, Parks and Tourism ("the KDWPT"), which was the Division of Tourism when she began there. Humphrey was the only black employee in the seven-person tourism office; the others were white. Humphrey's job responsibilities included preparing a tourism magazine and financial transaction documents as well as handling the travel arrangements for the

division's employees. While Humphrey worked at the KDWPT, Becky Blake—a white female—was her immediate supervisor.

Humphrey and fiscal manager Regina Nicol shared the finance-related responsibilities for the division until Nicol retired. They had complained to supervisors multiple times, seeking additional help with those duties and suggesting that the division's administrative assistants shoulder some of the responsibility. In 2006, Humphrey complained that she was having difficulty handling her workload, so the department reassigned the preparation of financial transaction documents to another employee. According to Humphrey, the reassignment was "a disaster," so the responsibilities came back to her. After this, requests by Humphrey or Nicol for help with their work were denied. Humphrey knows of no evidence that would suggest these denials by management were racially motivated and admits she was treated the same as Nicol when she complained about the need for help with the workload.

After the 2010 Kansas gubernatorial election, Assistant Secretary Linda Craghead assigned additional public tasks to Humphrey because she thought Humphrey presented a more professional appearance than the other employees. In November 2011, Humphrey cut back her weekly hours at a second job at the YWCA from thirty to thirteen as a result of her heavy workload at KDWPT. When Nicol retired in April of 2012, her share of the financial work fell on Humphrey, who received instructions to "clear her desk" of non-financial work to handle the increased workload.

Humphrey suffers from degenerative disc disease and diabetes. Starting in 2009, her impairments caused her to miss substantial amounts of work time. She used all of

her vacation and sick leave credits as they accrued and sometimes had to apply for unpaid FMLA leave. When Humphrey was absent her work would accrue, as it was not reassigned to other workers. In April of 2012, Humphrey suffered an injury to her L5 disc, which eventually required hospitalization for three days. This injury continued to affect Humphrey's ability to work until her termination in June of 2012.

At the beginning of June, Ms. Humphrey had severe sinusitis, which—in combination with her diabetes and disc disease—caused her to miss some work days during the week of June 4. Humphrey's work piled up in her absence. After coming to work for less than an hour on the morning of Friday, June 8, Humphrey left just after 7 a.m. and provided no written explanation. She left her key to the front door on the desk of KDWPT Secretary Robin Jennison. Humphrey left a voicemail for Blake that morning after leaving: "Becky, this is Pris. Listen, I left my building key on Robin's desk, umm, if you need me to come in Monday and write something formally as far as a resignation goes I will do that Monday morning. Thanks bye." Humphrey explained in her deposition that she left the key on Jennison's desk because she was upset and ill. Humphrey had been ill before—she had even taken FMLA leave earlier that week—but she did not testify that she turned in her door key during any other spell of illness.

Later that day, Blake spoke with Humphrey on the phone. The content of the conversation is in dispute, but the parties agree that Blake said she would take possession of the door key until Humphrey had a chance to think over her decision. On Saturday, June 9, Humphrey emailed Blake and Craghead indicating she wanted to go on unpaid FMLA leave.

3

On Monday, June 11, Blake explained the situation to Secretary Jennison and Assistant Secretary Craghead. Blake told them that Humphrey had clearly expressed her intention to quit on Friday without giving written notice two weeks in advance, as required by Kansas Administrative Regulation 1-11-1. Due to Humphrey's failure to provide the requisite notice, Blake understood that Secretary Jennison had the sole authority to decide whether Humphrey could return to work.[1]

Believing Humphrey had resigned and then changed her mind without giving her two-week notice, Jennison made the decision not to reemploy her. Jennison testified at his deposition that he had faced a similar decision when Sheila Wells had resigned in writing just a month before, then asked to retract the resignation before the date it was to take effect.[2] Jennison made a policy decision that, in order to maintain discipline within the agency, he would not permit Wells to continue working at KDWPT. Jennison considered Humphrey's situation to be similar, although he noted that Wells had given proper written notice and Humphrey had not. Jennison added that Wells had been a "tireless worker with emotional ups and downs," while Humphrey "had a substantial problem with absenteeism." As a result of his meeting with Humphrey on June 11, 2012, Jennison was unconvinced that she should be allowed back to work. Humphrey claims Jennison told her he was inclined to use her termination to "set precedent."

---

[1] Indeed, K.A.R. 1-11-1(b) states that "an employee may withdraw a resignation," but conditions this withdrawal on "the approval of the appointing authority."

[2] Humphrey testified at her deposition that Sheila Wells verbally told supervisors that she was quitting many times but being allowed to continue working despite these outbursts. Humphrey does not provide any evidence that Wells's supervisors took her frequent threats to quit seriously until she gave written notice, at which time she was not allowed to rescind her notice. More importantly, Humphrey also does not provide any evidence that Jennison—the decisionmaker in this case—made the decision to allow Wells to continue working after her verbal resignations.

Ultimately, Jennison decided not to allow Humphrey to work at KDWPT, reasoning that if he made an exception for her, Sheila Wells would have justifiably felt she had been treated differently a month earlier.

On October 10, 2012, Humphrey filed a charge of discrimination with EEOC, complaining she had been terminated involuntarily because of her race and color. The EEOC issued a Dismissal and Notice of Rights on January 8, 2013. Humphrey did not pursue administrative relief through a state civil service appeal. She received ongoing unemployment compensation in part because she was physically unable to return to work.

Humphrey filed her complaint in federal court on March 20, 2013, claiming a violation of Title VII for disparate treatment by the KWDPT because of her race. Humphrey alleges that Blake assigned her "much more work and responsibility than she could reasonably complete, while her white coworkers were allowed to be less productive." Humphrey also alleges she was treated differently than Sheila Wells, who was allowed to return to work after giving numerous informal resignations.

**II. Legal Standard**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A disputed fact is "material" if it is essential to proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City &*

*County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

III. Analysis

Humphrey claims she was discriminated against because of her race while employed by the KDWPT. Title VII makes it unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *See Crowe v. ADT Sec. Servs. Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination by showing: 1) she belongs to a protected class; 2) she was qualified for the position; 3) she suffered an adverse employment action; and 4) she was treated less favorably than others not in the protected class. *Exum v. U.S. Olympic Comm.,* 389 F.3d 1130, 1134 (10th Cir. 2004).

The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002). If the defendant does so, the burden shifts back to the

6

plaintiff to show by a preponderance of the evidence that that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext. *Id*. "To raise an inference of pretext in the face of the employer's legitimate, non-discriminatory explanation, the plaintiff must undermine the employer's credibility to the point that a reasonable jury could not find in its favor." *See Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1310 (10th Cir. 2005); *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169 (10th Cir. 2007). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The court finds that even if Humphrey is able to establish a prima facie case, she is unable to overcome the KDWPT's legitimate non-discriminatory reasons for terminating her employment. The court held in a prior order that Humphrey's complaint alleged a prima facie case on this claim. Humphrey has provided evidence in support of each element, suggesting she could establish the elements of a prima facie race discrimination case. As a black female, there is no dispute that Humphrey belongs to a protected class. Humphrey testified at her deposition that she is qualified for the position she lost, fulfilling the second element. Humphrey provided evidence that she was assigned a workload greater than her white counterparts until her employment ended due to her being unable to complete the work. Although the KDWPT disputes this, the court construes the evidence in favor of Humphrey at this stage. Additionally, Humphrey alleges that another similarly-situated employee, Sheila Wells, gave

7

numerous informal resignations and KDWPT did not terminate her. Because Humphrey was terminated after giving an informal resignation, she may be able to show that she was treated differently from Wells. Even so, Humphrey ultimately fails to establish racial discrimination by the KDWPT.

Humphrey's complaint specifically alleges she was assigned larger workloads than her white counterparts, which eventually led to her termination for failing to complete all of her work. KDWPT contends that the increased workload experienced by Humphrey was a natural consequence of employment turnover within her department, a legitimate, non-discriminatory reason supported by the facts. Approximately a month before Humphrey's employment with KDWPT ended, the fiscal manager that shared job duties with Humphrey, Regina Nichol, retired. After Nichol's retirement, Humphrey's workload increased because she was asked to take on Nichol's duties. Humphrey claims that some of this workload should have been allocated to other employees in the office. However, the other employees did not work in the same position as Humphrey or the retired employee. Further, Humphrey admitted in her deposition that she was the only one in her division that could have done the work and a "disaster" ensued as a result of an earlier attempt to reassign some of her work to others.

Even if Humphrey can establish a prima facie case, these facts establish a legitimate and non-discriminatory reason for Humphrey receiving more work. The retirement of the fiscal manager and the lack of other employees in a position to help Humphrey contributed to her increased workload. Humphrey has not presented any

evidence to undermine this explanation as pretextual. To the contrary, Humphrey supports the KDWPT's assertions by testifying that she received more work due to the retirement of Regina Nicol rather than because of any race-related reason. Further, she testified that she was the only other person in her division that could complete the work. She also testified that her requests for more help were treated the same as Nicol's requests: they were each denied, regardless of their race.

Additionally, the KDWPT provides testimony from multiple witnesses supporting its claim that Humphrey's employment was terminated as a result of her resignation without giving proper notice under the Kansas administrative regulations. The Kansas Administrative Regulations establish a two-week written notice requirement for employees. K.A.R. 1-11-1(a). The regulations state: "Any appointing authority may consider the fact that a person did not give the required notice when the person resigned from earlier employment with the state to be grounds for refusal to employ that person." *Id.*

The undisputed facts show that Humphrey left her door key on the Secretary's desk and then left a voicemail on her supervisor's desk explaining her action and offering to "write something formally as far as a resignation goes" on the next business day. Humphrey testified at her deposition that her main reason for leaving the key was not to resign. Humphrey's testimony cannot contradict the contents of a voicemail recording. Humphrey testifies that she left the key on Jennison's desk merely because she was ill. However, she did not testify that she took this action whenever she went on leave. Considering that she had taken FMLA and sick leave on multiple prior

9

occasions—including earlier that same week—and had not left her key or left a voicemail offering to sign a resignation when she took that leave, the fact that Blake and Jennison reasonably interpreted Humphrey's acts as a resignation is not in dispute.

After meeting with Humphrey, Jennison did not allow her to rescind her resignation, citing office discipline and stating that he wanted to use Humphrey's resignation to "set a precedent," presumably that such actions would not be tolerated. Humphrey alleges that a white employee, Sheila Wells, was allowed to return to work after verbally resigning several times. However, Humphrey provides no evidence that any of Wells's supervisors took seriously any of these apparently frequent threats to quit until Wells gave her written notice, which she was not allowed to rescind. Additionally, Humphrey provides no evidence that Jennison was the decisionmaker in allowing Wells to return. Jennison also testified that Wells was a tireless worker, while Humphrey had an absenteeism problem, which tends to suggest these employees were not similarly-situated. Further, Jennison terminated Wells after she gave her required two-week notice of resignation, a regulatory standard by which Humphrey did not abide. This failure to follow the state regulations qualifies as a legitimate non-discriminatory reason for Jennison's refusal to rehire Humphrey.

Most detrimental to Humphrey's claims is the lack of any evidence that race played a part in anything that happened to her while she was employed at KDWPT. When asked at her deposition what evidence, other than her own subjective belief, Humphrey had that the KDWPT's actions were racially motivated, Humphrey cited statements by Linda Craghead and Robin Jennison that "nobody gets anything for free"

10

and that Jennison would use her "to set a precedent." But Humphrey does not explain how these statements are related to race. Humphrey relies solely on the inference established by her prima facie case that she was treated differently from a white employee, Sheila Wells. But Humphrey simply provides no evidence that tends to show this different treatment was because of her race.

Considering the KDWPT to have met its burden of producing a legitimate non-discriminatory reason for the additional workload and Humphrey's termination, Humphrey bears the ultimate burden of persuasion beyond a preponderance of the evidence that she was discriminated against because of her race. *See Burdine*, 450 U.S. at 253. The court finds that no reasonable jury could find that Humphrey's evidence establishes racial discrimination by the KDWPT in this case. Accordingly, the court grants summary judgment to the KDWPT on Humphrey's race/color discrimination claim.

IT IS THEREFORE ORDERED this 2nd day of April, 2014, that the State of Kansas Department of Wildlife, Parks and Tourism's Motion for Summary Judgment (Dkt. 32) is granted.

s/ J. Thomas Marten  
J. THOMAS MARTEN, JUDGE